UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RYAN M. DIETZ,

               Petitioner,

    v.

DAVE DAVEY, Warden,

               Respondent.

_____/

No. C 16-7165 WHA (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

**INTRODUCTION**

Petitioner, a California prisoner proceeding pro se, filed a petition for a writ of habeas corpus challenging his conviction pursuant to 28 U.S.C. 2254.  Respondent was ordered to show cause why the writ should not be granted on the following claims: (1) instructional error; (2) insufficient evidence; (3) exclusion of exculpatory evidence; and (4) prosecutorial misconduct.  Respondent filed an answer and a memorandum of points and authorities in support of it.  Petitioner has not filed a traverse.  For the reasons set forth below, the petition is **DENIED**.

**STATEMENT**

**I.     PROCEDURAL BACKGROUND**

On June 28, 2013, a Sonoma County jury found petitioner guilty of the first-degree murder of Jack Romero and found true the allegations that petitioner personally used and intentionally discharged a firearm in committing the offense.  Ex. A, 3 Clerk's Transcript ("CT") 605-06; ECF No. 7-5 at 116-17.  On November 14, 2013, the trial court sentenced petitioner to 50 years in prison.  CT 714R; ECF No. 7-5 at 243.  Petitioner appealed and, on May 29, 2015, the California Court of Appeal affirmed the judgment in an unpublished decision.  (Exh. F); *see also People v. Dietz*, 2015 WL 3429946 (Cal. App. May 29, 2015).  On September 9, 2015, the California Supreme Court

denied review.  (Exh. H).

## II.    FACTUAL BACKGROUND

Petitioner and Garicka Rush were involved in a long-term live-in relationship and had three children together.  Petitioner owned a Chevy Avalanche truck and Rush owned a silver 2004 Toyota Sienna minivan.  In 2009 or early 2010, Romero became their next-door neighbor and Rush and Romero began a sexual relationship.  Rush told petitioner about the affair and they argued about it frequently.  In May or June 2011, petitioner and Rush had a heated argument after petitioner saw a missed call or text message from Romero on Rush's phone.  Petitioner told Rush to stop seeing Romero or she "was going to end up making him do something stupid," and said he dreamed about murdering Romero.

On June 28, 2011, Rush and Romero had plans to get together, but Rush's sister went into labor and Rush drove her sister to the hospital in petitioner's Chevy Avalanche.  Rush stayed at the hospital until 9:30 p.m., but falsely told petitioner on the phone that she would be there for a few more hours, to give herself the opportunity to spend time with Romero.  At about 10:00 p.m., Rush picked up Romero at his home and they drove to the Third Street Aleworks, a restaurant in downtown Santa Rosa.  Rush parked the Avalanche behind the restaurant, on Second and D Streets.  They walked down a dark pedestrian alley that passed by a parking garage and entered the restaurant through the back door.  When the restaurant closed at midnight, they chatted with a few people outside the front door.  At some point, Rush noticed that Romero was gone.  As she continued to talk to the people, she heard a series of loud pops which she thought were fireworks or firecrackers.

Billy With, Alexandra Prada and Adam Beltz were changing a flat tire on With's car nearby when they heard gunshots.  With recalled hearing five or six shots and then, after a pause, six or seven more shots.  Prada ran toward the shots and saw a man walking to a silver minivan.  With also saw the man get into a silver minivan.  Beltz saw the man holster a weapon and get into "a silver Honda Odyssey minivan."

Rush assumed Romero had gone back to the truck or had gone around the corner to urinate.  Rush tried to call Romero on her phone but he did not answer.  When police officers arrived, they led Rush to an area near the alley marked with yellow tape and Rush recognized the body on the ground

2

as Romero.

The next day, petitioner called Rush and instructed her to find a large box with two shoe boxes inside from the garage and to retrieve a bag with a box inside from the driver's side-wheel well compartment of the Avalanche. He told her to dispose of the boxes in different dumpsters. Rush followed these instructions. Police officers, who had been surveilling Rush, retrieved the items she placed in the dumpsters. The shoe boxes contained boxes of Wolf .223-caliber ammunition, typically used in high-powered weapons. The trash bag contained a box of Winchester Smith & Wesson .40-caliber ammunition. Officers arrested Rush at her home and, having made the connection between petitioner and Rush, arrested petitioner at his place of employment.

With later identified petitioner in a photo lineup as the man he had seen walking to the van after hearing gunshots on the night of the murder. Prada identified petitioner in a live lineup as the man who walked to the minivan.

Google Latitude, a location-sharing application, was installed on Rush's and petitioner's cellphones. The application on Rush's phone was installed on June 16, 2011, twelve days before the murder. Rush testified that she was not aware that this application was on her phone. The records from petitioner's cellphone showed, on the night of the murder at 10:00 p.m., he saw the location of Rush's phone at Third and D Streets in Santa Rosa. The Latitude application on petitioner's phone was deleted on the morning after the shooting.

Security videos from buildings near the crime scene, taken on the night of the shooting, showed a minivan turning on D Street near the scene of the shooting at about 11:35 p.m., approximately thirty minutes before witnesses heard shots fired. Rush and other witnesses testified that petitioner's Chevy Avalanche, which Rush drove that night, was parked on Second and D Streets. The videos showed the minivan going past the parked Avalanche, making a u-turn mid-block and parking near the Avalanche. A detective who later drove Rush's silver Toyota minivan past the same cameras during a nighttime reenactment concluded the van in the videos from the night of the shooting looked the same as Rush's Toyota minivan.

The forensic evidence at the scene of the shooting included 11 casings fired from a single semiautomatic weapon. The distribution of the spent cartridges suggested the shooter was moving

3

while firing the shots. Cartridge cases from the crime scene were made by Smith & Wesson, which was the manufacturer of one box of ammunition recovered from the dumpster. The bunter marks (marks created by a bullet manufacturing tool that produces the head stamp on cartridge cases), on some of the cartridges recovered from the scene were similar to those on the ammunition in the box found in the dumpster, suggesting they were manufactured and stamped by the same tool.

The coroner found a total of 11 gunshot wounds in Romero's body. Seven of the shots entered the back of Romero's body, with exit wounds on the front. One of the bullets, in Romero's neck, was fired from a distance of one to three feet away. A wound in Romero's buttock was at a sharply downward angle, suggesting the shooter was positioned above Romero when he fired.

## ANALYSIS

### I. STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d). The first prong applies to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller El v. Cockrell*, 537 U.S. 322, 340 (2003). Under 28 U.S.C. 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Id.*; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). To obtain habeas relief from a federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded agreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion from the state courts. *Ylst v. Nunnemaker*, 501

U.S. 797, 801-06 (1991). The last reasoned state court decision on petitioner's claims is the decision by the California Court of Appeal on direct review.

**II. ISSUES PRESENTED**

**A. LYING-IN-WAIT INSTRUCTION**

Petitioner claims his due process rights were violated because there was insufficient evidence to support the lying-in-wait instruction as a theory for first degree murder.

At petitioner's trial, the jury was instructed on two theories of first-degree murder: (1) willful, deliberate and premeditated murder; and (2) lying-in-wait. Under California law, lying-in-wait murder consists of three elements: (1) concealment of purpose; (2) a substantial period of watching and waiting for an opportune time to act; (3) immediately followed by a surprise attack on an unsuspecting victim from a position of advantage. *People v. Morales*, 48 Cal. 3d 527, 557 (1989), *overruled on other grounds in People v. Williams*, 49 Cal. 4th 405 (2010). Concealment is satisfied if a defendant's true intent and purpose were concealed by his actions or conduct; literal concealment from his victim is not required. *People v. Sims*, 5 Cal. 4th 405, 431-33 (1993).

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *Id.* at 72. The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Ibid.* A conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one. *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam). Such instructional error is not structural; rather, a reviewing court must apply the harmless-error analysis set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and determine whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Ibid.*

The California Court of Appeal determined there was sufficient evidence to support the lying-in-wait instruction. This conclusion is not objectively unreasonable in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. 2254(d)(2).

The first element, concealment, was satisfied by the following evidence. From Rush's testimony, it was established that petitioner was jealous of Romero because Romero and Rush were having a sexual relationship. Rush's testimony showed she was not aware that Google Latitude, a tracking application, was on her cellphone. From this, the jury could infer that petitioner installed Google Latitude on Rush's phone, unbeknownst to Rush, for the purpose of tracking her whereabouts. The records from petitioner's cellphone showed he saw the location of Rush's phone at 10 p.m. on the night of the murder at Third and D Streets in Santa Rosa. The surveillance videos showed that petitioner drove the Toyota minivan to that location at 11:35 p.m. on the night of the murder. Petitioner knew it was likely he would find Romero with Rush because they had been spending time together. This evidence establishes petitioner's planning activity to shoot Romero, a plan which he concealed from Romero.

The second element, a substantial period of watching and waiting for an opportunity to act, is satisfied by the surveillance videos showing that petitioner parked the minivan near his Avalanche, indicating he knew Rush and, most likely, Romero were close-by. Petitioner watched and waited approximately 30 minutes for an opportunity to act.

The third element, a surprise attack from a position of advantage, is established by the location of the murder in a dark alleyway which allowed petitioner to perpetrate a surprise attack on Romero from a position of advantage. The forensic evidence established, from the location of the ejected cartridge cases, the shooter was moving from one end of the alley to the other. There were eight entry wounds to Romero's back, with one close range shot from 1 to 3 feet away. Given that the shooting occurred very soon after Romero went missing, the jury could conclude that there was little time for discussion between the two men and that the eight wounds on Romero's back showed that petitioner did not shoot in self-defense. In light of this evidence, a reasonable jury could conclude that petitioner concealed his plan to shoot Romero, that he shot Romero after he watched and waited for an opportunity to undertake a surprise attack from a position of advantage.

Petitioner attempts to rebut the Court of Appeal's finding by arguing that there were no eyewitnesses who saw him at the scene and, thus, there is no evidence of what he was doing or thinking when he "allegedly encountered decedent Jack Romero." Although no eyewitnesses saw

6

petitioner shoot Romero, two eyewitnesses identified petitioner as the man who walked to a silver minivan after they heard many shots fired. Furthermore, the inferences that could be drawn from the circumstantial evidence cited above amounts to sufficient evidence to support the instruction.

Even if the lying-in-wait instruction was not supported by sufficient evidence, the error did not have a substantial and injurious effect or influence in determining the jury's verdict because the jury was given an alternative instruction for the verdict, first-degree murder based on premeditation and deliberation. As discussed in the next section, substantial evidence supported this instruction.

### B. INSUFFICIENT EVIDENCE

Petitioner claims his due process rights were violated because there was insufficient evidence to support the jury's finding of premeditation and deliberation. Petitioner argues there was no evidence of what happened in the alley on the night of June 28, 2011, no evidence that he knew Romero would be at the Third Street Aleworks that night and no evidence that he had a plan to shoot Romero.

Under California law, deliberate and premeditated first degree murder requires the careful weighing of considerations in forming a course of action which is thought over in advance. *People v Mendoza*, 52 Cal. 4th 1056, 1069 (2011). Three categories of evidence have been found sufficient to sustain a finding of deliberation and premeditation: (1) the defendant's actions prior to the killing directed toward the killing, in other words, planning the killing; (2) the defendant's prior relationship to or conduct toward the victim from which the jury could infer motive; and (3) the manner of the killing from which the jury could infer that the defendant must have intentionally killed according to a preconceived design. *People v. Anderson*, 70 Cal. 2d 15, 26-27 (1968).

A prisoner states a constitutional claim if he alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 321-24 (1979). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt.'" *Ibid.* (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. *Jackson*, 443 U.S. at 324. After AEDPA, a federal habeas court applies the standards of *Jackson* with an additional layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Generally, a federal habeas court must ask whether the state court decision reflected an unreasonable application of *Jackson* to the facts of the case. *Id.* at 1275 (quoting 28 U.S.C. 2254(d)).

The California Court of Appeal reasonably concluded that a rational trier of fact could have found beyond a reasonable doubt that petitioner killed Romero with deliberation and premeditation. The first element, planning, was established by evidence that petitioner and Rush had repeated arguments about her affair with Romero. During one argument, petitioner told Rush he dreamed of killing Romero and that if she did not stop seeing Romero, "she was going to end up making him do something stupid." From Rush's testimony that she did not know the Google Latitude application was installed on her cellphone, the jury could infer that petitioner installed it on both his and Rush's cellphones, unbeknownst to Rush, for the purpose of tracking her location. The jury could reasonably have concluded that, on the night of June 28, 2011, petitioner tracked Rush's location using the Latitude application and, given the ongoing relationship between Rush and Romero, petitioner would have suspected he would find them together. The surveillance video footage from buildings near the crime-scene support the inference that petitioner drove his vehicle to the area at least 30 minutes before the shooting, saw his Avalanche, parked nearby and waited there. From this evidence, the jury could reasonably have found that petitioner's planning activity began when he installed the Latitude application on the cellphones and continued with his tracking Rush on June 28, 2011 and then waiting until Romero appeared.

The second element, motive, was established by the evidence that petitioner was jealous of the ongoing sexual relationship between Romero and Rush, as shown by the frequent arguments he had with Rush to try to persuade her to end the affair. That petitioner told Rush that he dreamed of killing Romero shows the extent of his jealousy.

The third element, the manner of killing from which the jury could infer the killing was by preconceived design, is shown by the forensic evidence. Petitioner shot Romero eleven times, at least

8

six shots were in Romero's back, one gunshot wound in Romero's neck was fired at close range and the angle of one wound suggested petitioner was standing over Romero when he fired. The bullet casings showed that petitioner was shooting Romero as he walked toward him and kept on shooting as Romero attempted to run away. Petitioner could have stopped after his first shot, but kept on until he was standing over Romero while he was on the ground and shot him again to ensure that he was dead. Billy With, a witness at the scene, heard a series of gunshots, a pause, and then several more shots, suggesting petitioner had time to reflect as the shooting was in progress. Viewing this evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of premeditation and deliberation beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319.

### C. EXCLUSION OF EVIDENCE

Petitioner claims his due process rights were violated by the trial court's exclusion of evidence of Romero's gang ties and Rush's association with violent people.

During the trial, the defense moved for the admission of evidence that Romero was associated with a gang and routinely carried a gun to support the defense theories of self-defense and third-party culpability. The defense also moved to admit evidence of a 2006 incident in which petitioner's friend, John Purkey, confronted Rush while she was with two other men and told her he would tell petitioner, after which the two men stabbed Purkey in his leg and thumb. Defense counsel argued this showed petitioner knew Rush kept company with violent men and suggested he was carrying a gun for self-protection when he went to look for her, rather than to kill Romero. Petitioner argues that, if this evidence were admitted, even if the jury found he killed Romero, it would have been without the planning and premeditation necessary for first-degree murder.

The trial court excluded gang evidence under California Evidence Code section 352, finding that it was more prejudicial than probative since Romero's alleged gang ties were in 2007 or 2008, three years before Romero's murder. The court also excluded evidence of the Purkey incident under section 352, finding that it was not relevant to the case because it did not involve Romero and was remote in time. The court allowed Rush to testify that she had seen Romero with a gun.

"[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules

9

excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (alteration in original); *see also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (due process does not guarantee a defendant the right to present all relevant evidence). This latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. *Holmes*, 547 U.S. at 324. "[W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 325-26; *see Egelhoff*, 518 U.S. at 42 (the exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."). The right to present a complete defense is only implicated when the evidence the defendant seeks to admit is "relevant and material, and . . . vital to the defense." *Washington v. Texas*, 388 U.S. 14, 16 (1967). Moreover, a violation of the right to present a defense merits habeas relief only if the error was likely to have a substantial and injurious effect on the verdict. *Lunbery v. Hornbeam*, 605 F.3d 754, 762 (9th Cir. 2010) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

The California Court of Appeal persuasively explained why evidence of Romero's alleged gang association and the Purkey incident were excluded. First, because no admissible evidence showed petitioner was aware of Romero's gang affiliation, it was not relevant to show that petitioner was carrying a gun to protect himself from Romero. *People v. Dietz*, 2015 WL 3429946, *6. Second, there was no admissible evidence to show that Romero might have been murdered by a rival gang member. *Ibid.* Third, because the Purkey incident involved people other than Romero, it could not explain why petitioner shot Romero nor could it help in petitioner's theory he shot Romero in self-defense. *Id.* at *7 Finally, from Rush's testimony on cross-examination, the jury knew that Romero was involved in illegal drug activity, that he kept a handgun under his pillow and that he often carried a gun with him when he and Rush went out; therefore, the information about Romero's gang ties or the Purkey incident was not likely to have changed the result of the verdict. *Ibid.*; *see Brecht*, 507 U.S. 637-38 (violation of right to present defense warrants habeas relief only if it was likely to have a substantial and injurious effect on the jury's verdict).

10

## D. PROSECUTORIAL MISCONDUCT

Petitioner claims the prosecutor committed misconduct by misrepresenting the burden of proof to the jury.

In his rebuttal argument, the prosecutor projected a slide from a pointillist painting by the artist Georges Seurat and made the following comments after a defense objection was overrruled:

> Post-impressionist painter, George Seurat, painted with a type of art called pointillism. And he would take varying colors and place dots on his paintings, to draw a picture. And there comes a point as in Seurat's paintings that you have to get up from your chair and stand back and take a look at the big picture. The totality of the circumstances in this case. There's a lot of evidence in this case. There are a lot of pieces to the puzzle. And sometimes you have to stand back to get a good view to consider it all. And that's what Seurat did. That's what you have to do.
>
> Common sense, ladies and gentlemen. If it doesn't sound right, in the general scheme of things, considering the totality of the circumstances, if it doesn't fit, that puzzle piece doesn't fit, if it doesn't make sense to you, if it's not, if it doesn't sound reasonable to you, then it's not reasonable. But if it sounds appropriate, if the pieces of the puzzle fit, if it makes sense, it is reasonable. To adopt the position that Ryan Dietz did not kill Jack Romero would be unreasonable, given the fact that all the evidence point to Ryan Dietz. Every bit of it.

Ex. B., 39 Reporter's Transcript (RT) 3886-87; ECF No. 7-45 at 156-57.

Petitioner argues the prosecutor's suggestion that the jury "stand back and take a look at the big picture" and base its verdict on the "totality of the circumstances," told the jury to disregard the rule, that in a circumstantial evidence case, each link in the chain of evidence necessary to establish guilt must be established beyond a reasonable doubt.

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). Factors which a court may take into account in determining whether misconduct rises to a level of due process violation are: (1) the weight of evidence of guilt, *see United States v. Young*, 470 U.S. 1, 19 (1985); (2) whether the misconduct was isolated or part of an ongoing pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct relates to a critical part of the case, *see Giglio v. United States*, 405 U.S. 150, 154 (1972); and (4) whether a prosecutor's comment misstates or manipulates the evidence, *see Darden*, 477 U.S. at 182. In determining whether a due

11

process violation occurred, arguments of counsel generally carry less weight than instructions from the court. *Boyde v. California*, 494 U.S. 370, 384 (1990).

In denying this claim, the Court of Appeal carefully considered the instructions given to the jury on circumstantial evidence, the presumption of innocence, the standard of proof beyond a reasonable doubt and the sufficiency of circumstantial evidence and, in light of these instructions, concluded, "Asking the jury to view the evidence as a whole does not suggest they could return a verdict without finding all of the links necessary to convict." *Dietz*, 2015 WL 3429946, at *10.

The Court of Appeal's opinion was not contrary to or an unreasonable application of Supreme Court authority. As indicated above, arguments of counsel carry less weight than instructions from the court. The trial court gave the following instructions:

(1) The presumption of innocence and reasonable doubt: A defendant in a criminal case is presumed to be innocent. This presumption requires that the People proved the defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. 39 RT 3742; ECF No. 7-45 at 12.

(2) Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. 39 RT 3745; ECF No. 7-45 at 15.

(3) Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilty, you must accept the one that points to innocence. 39 RT 3745; ECF No. 7-45 at 15.

(4) You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions. 39 RT 3740; ECF No. 7-45 at 10.

Given these instructions, it was not reasonably likely that the jury interpreted the prosecutor's comments about the pointillist painting to mean that it did not have to find beyond a reasonable doubt each piece of circumstantial evidence upon which it relied. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (jury is presumed to follow its instructions). In fact, in her closing argument, the prosecutor gave the circumstantial evidence instruction to the jury, stating, "So before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion

beyond a reasonable doubt." 39 RT 3803; ECF No. 7-45 at 73. Under these circumstances, the prosecutor's use of a pointillist painting to illustrate how individual pieces of evidence come together to produce a whole picture was not improper nor did it lessen the burden of proof. In short, the challenged comments did not constitute prosecutorial misconduct.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

A certificate of appealability will not issue because reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the United States Court of Appeals.

The clerk shall enter judgment in favor of respondent, and close the file.

**IT IS SO ORDERED.**

Dated: July 30, 2018.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE